**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS**

I, Galen Doud, being sworn, state:

**Introduction and Agent Background**

1. I have been employed as a special agent with the Drug Enforcement Administration ("DEA") since May 2017, and am currently assigned to DEA's Manchester, New Hampshire, District Office. My primary duties as a DEA Special Agent include investigating federal crimes and violations of the Controlled Substances Act at the local, national, and international level. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. While attending the DEA Training Academy, I received training on a multitude of topics pertaining to drug investigations. I have been involved in numerous drug investigations. I have also participated in both physical and electronic surveillances, the purchase of illegal drugs, enforcement operations including the execution of both search warrants and arrest warrants, and interviews of sources of information, confidential sources, drug traffickers, and drug trafficking organizations. I am also a member of DEA's Special Response Team as well as DEA's Clandestine Laboratory Enforcement Team.

3. Prior to being employed as a DEA Special Agent, I was employed as a full-time police officer with the City of Nashua, New Hampshire Police Department for approximately four and one half years. I made several hundred arrests and initiated, conducted, and assisted in even more criminal investigations, many of which involved drug violations. I worked as a police officer in a uniformed and plain-clothed capacity, and debriefed numerous defendants and cultivated many sources of information and confidential sources pertaining to drug trafficking

organizations. I have also attended multiple trainings about drug related investigations, and relevant topics associated with drug investigations. I have a Bachelor of Science degree in Criminal Justice from Northeastern University.

4. I have participated in numerous investigations relating to the distribution of controlled substances, including fentanyl, heroin, cocaine and other substances, in violation of the federal anti-drug laws, including violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance) (the "Target Offenses").

5. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, and other means to facilitate their illegal activities.

## Purpose of the Affidavit

6. I submit this affidavit in support of an application for warrants to search the following electronic equipment seized from Angel David Aybar CARMONA, a/k/a "Pinki," at the time of his arrest on December 8, 2020 (collectively, the "Target Phones"):

    a. A silver iPhone bearing IMEI number                          2058 and assigned call number (           -9811 ("Target Phone #1"); and

    b. A large, blue iPhone with a light blue case ("Target Phone #2").

The Target Phones are in the possession of law enforcement officials, as described in Attachments A-1 and A-2. There is probable cause to believe that the Target Phones contain evidence and instrumentalities of the Target Offenses, as described in Attachment B.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause to believe that evidence of the Target Offenses, described more fully in Attachment B, exists in the Target Phones, described more fully in Attachments A-1 and A-2.

**Probable Cause**

*CARMONA Provided the Number for Target Phone #1 to UC-1 with a Fentanyl Sample.*

8. On December 2, 2020, at approximately 7:50 p.m., a law enforcement investigator acting in an undercover capacity ("UC-1") was parked in his vehicle near the intersection of                                     in Lawrence, Massachusetts. A Hispanic man wearing a black leather jacket approached UC-1's vehicle, walked past the vehicle several times, and eventually approached the front, passenger window.[1] Once at the car window, UC-1 lowered the window and CARMONA said "sample." Based on my experience and training, I know "sample" to mean a sample of drugs, usually meaning fentanyl in the greater Lawrence area. CARMONA then

---

[1] This man was later identified as CARMONA after his December 8, 2020 arrest described below. I will refer to him as CARMONA for the remainder of this affidavit.

dropped a small plastic bag with a substance wrapped in paper inside the plastic bag. On the paper in the bag, a partial phone number was visible. Based on my experience and training, it is common practice in Lawrence for drug dealers to provide drug samples with their phone numbers to potential customers. Using words and hand gestures, CARMONA indicated that he wanted UC-1 to take his phone number. CARMONA indicated his name was "Pinki" and told UC-1 to call him. CARMONA gave UC-1 his cell phone and UC-1 called a phone number used by UC-1 from CARMONA's cell phone. CARMONA's cell phone number was         9811, the number assigned to Target Phone #1. Based on my training and experience, I understood CARMONA to be providing UC-1 with his cell phone number so that UC-1 could call CARMONA to arrange for the sale of narcotics.

9.   UC-1 transported the sample of suspected drugs to a law enforcement facility where it was logged into evidence. The sample was sent to the DEA laboratory for testing. It tested positive for the presence of fentanyl and weighed 1.13 grams.

*CARMONA Used Target Phone #1 To Arrange to Sell Fentanyl to UC-1.*

10.   Beginning on December 2, 2020, UC-1 began exchanging text messages with CARMONA at Target Phone #1 for the purpose of arranging a drug transaction. All text message communications between UC-1 and Target Phone #1 were conducted in English and have been preserved. CARMONA stated, "From now on write to me for what you need." UC-1 responded, "What do you have?" CARMONA responded, "I have brown and it is very good[.] I know you will like it and your friend." CARMONA continued, "I have brown[.] It is the best and I will accommodate the prices[.]" Based on my training and experience, I know that

"brown" is street slang for fentanyl and understood CARMONA to be offering to sell UC-1 fentanyl.

11.     The text exchange continued over Target Phone #1. UC-1 and CARMONA negotiated the price for a finger, or 10 grams, of fentanyl. CARMONA agreed to a price: "I can give it to you at 180 and I'm accommodating you here they sell them at 200[.]" After additional negotiation, CARMONA stated, "[Y]ou tell me if we can negotiate, I have 12 fingers, I can give it to you at once with me, you will not have to wait long[.]" Based on my experience and training, I believe CARMONA agreed to sell UC-1 12 fingers, or 120 grams, of fentanyl for $180 per finger.

12.     Between December 2, 2020 and December 8, 2020, UC-1 and CARMONA, using Target Phone #1, continued to exchange text messages regarding the drug deal. They eventually agreed to a final price of $175 per finger.

*On December 8, 2020, CARMONA Used Target Phone #1 to Complete
the Sale of 117 Grams of Fentanyl to UC-1.*

13.     On December 8, 2020, at approximately 12:51 p.m., UC-1 and CARMONA, using Target Phone #1, exchanged text messages to finalize their arrangements for the drug sale. In lightly coded language, UC-1 asked CARMONA if he was ready to complete the sale. CARMONA responded, "Good friend, I'm ready too, I already have my fingers in the bag ready for you[.]" Based on my training and experience, I believe CARMONA was referring to the 12 fingers of fentanyl he had agreed to sell to UC-1. UC-1 and CARMONA eventually agreed to meet at the                                             in Lawrence to complete the drug sale.

14.     On December 8, 2020, at approximately 1:00 p.m., UC-1 and another investigator acting in an undercover capacity ("UC-2") met with other investigators at a predetermined

location. At the location, investigators outfitted UC-2 with an audio / video recording device and provided UC-2 with $2,100 of sham money to pay for the drugs.[2] Investigators then surveilled UC-1 and UC-2 as they drove to

15. At approximately 1:57 p.m., UC-1 and UC-2 arrived in the parking lot of the             A short time later, UC-1 observed CARMONA arrive in the parking lot of the             Investigators observed him walk into the             and exit a short time later. CARMONA then left the parking lot and walked back in the direction from which he came. During this time, UC-1 sent several text messages to CARMONA at Target Phone #1 to describe where UC-1 was located.

16. Approximately five to ten minutes later, CARMONA returned to the parking lot, this time accompanied by another male. At approximately 2:12 p.m., CARMONA, using Target Phone #1, sent a text message to UC-1 and stated, "I wear a black coat, enter the             as you are going to buy something and we go there." CARMONA also called and sent text messages from phone number             8370 to UC-1 to coordinate the meetup.[3] UC-1 and UC-2 then observed CARMONA enter the             and the other male remain outside.

17. UC-1 and UC-2 then entered the             and located CARMONA. UC-1 then said, "Pinki." CARMONA acknowledged. UC-1 recognized CARMONA as the man who provided UC-1 with the sample of suspected fentanyl on December 2, 2020. CARMONA was

---

[2] The audio / video recording device malfunctioned prior to the completion of the drug sale.
[3] UC-1 only became aware that CARMONA had used a different phone number to communicate with him after CARMONA's arrest. Because Target Phone #2 is currently locked and powered off, investigators have not been able to confirm whether Target Phone #2 is assigned phone number             8370.

wearing what appeared to be the same black leather jacket he had worn on December 2, 2020. CARMONA then reached into his jacket pocket and handed UC-1 a clear plastic bag containing 12 individually wrapped fingers of a brown powder substance consistent in appearance with fentanyl. UC-2 then handed the sham money to CARMONA. UC-1 and UC-2 then exited the store.

18.    Several minutes later, investigators observed CARMONA exit the store, meet the other male, and walk away from the premises. At that point, investigators arrested CARMONA. On CARMONA's person, they recovered the sham money and the Target Phones. After the arrest, investigators called the number assigned to Target Phone #1, and Target Phone #1 rang. The Target Phones were logged into evidence.

19.    The suspected drugs were transported back to a law enforcement facility and logged into evidence. The drugs were sent to the DEA laboratory for testing. The drugs tested positive at the DEA laboratory for the presence of fentanyl and weighed 117.3 grams.

20.    On January 5, 2021, a federal grand jury in the District of Massachusetts returned an indictment, which charged CARMONA with Distribution of and Possession with Intent to Distribute 40 Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi). *United States v. Carmona*, 21-cr-10004-DJC, Docket No. 14.

## Location of the Equipment

21.    The Target Phones are currently in the possession of investigators at the DEA office in Bedford, New Hampshire, as described in Attachments A-1 and A-2.

**Probable Cause to Believe that the Target Phones Contain Evidence and Instrumentalities of the Target Offenses**

22. As discussed above, the investigation has demonstrated that CARMONA used Target Phone #1 and another phone to participate in and facilitate the Target Offenses.

23. As discussed above, the Target Phones are currently being stored by investigators at their facilities as described in Attachments A-1 and A-2. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that they have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the investigators' possession.

24. In addition, based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking. These tasks are frequently accomplished through text messages, encrypted messages, and photographs. Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity. For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers). Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).

25. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of computer "hardware") can now function essentially as small computers. The Target Phones are smartphones. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

26. Based on my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

27. Based on my training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

> a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.
>
> b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.

        In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media, in particular computers' internal hard drives, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

    d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

28. Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that CARMONA has committed violations of the Target Offenses, and that evidence, fruits, and instrumentalities of these crimes,

as described in Attachment B, are contained within the Equipment described in Attachments A-1 and A-2.

                                              Respectfully submitted,

                                              /s/*Galen Doud*
                                              Galen Doud, Special Agent
                                              Drug Enforcement Administration

Sworn to telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on January __27__, 2021.

       ___/s/ Andrea K. Johnstone_____
       Hon. Andrea K. Johnstone
       United States Magistrate Judge

## ATTACHMENT A-1—Equipment to be Searched

The Equipment to be searched consists of the following electronic equipment seized from CARMONA on December 8, 2020:

    a. A silver iPhone bearing IMEI number            2058 and assigned call number            9811 ("Target Phone #1").

The Equipment is located at the DEA office in Bedford, New Hampshire in the evidence vault.

## **ATTACHMENT A-2—Equipment to be Searched**

The Equipment to be searched consists of the following electronic equipment seized from CARMONA on December 8, 2020:

    a. A large, blue iPhone with a light blue case ("Target Phone #2")

The Equipment is located at the DEA office in Bedford, New Hampshire in the evidence vault.

**Attachment B—Items to be Seized**

1. All records, in whatever form, and tangible objects that constitute evidence, or instrumentalities of 21 U.S.C. § 841 (possession with intent to distribute controlled substances) (the "Target Offenses") between January 1, 2020 and January 1, 2021, including those related to:

    a) records of drug trafficking activities;

    b) lists of customers and related identifying information;

    c) any information recording schedule, whereabouts, or travel, including calendar, e-mails, cell tower, and GPS data;

    d) all bank records, checks, credit card bills, account information, and other financial records;

    e) the identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

2. Evidence of user attribution showing who used or owned the Equipment at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

**Definitions**

For the purpose of this warrant:

A. "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any

      connections), and any security device, (such as electronic data security hardware and physical locks and keys).

B.    "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

C.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

D.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

E.    "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or instrumentalities of crime.